**Debra KEACH and Patricia Sage, Plaintiffs,**

v.

**U.S. TRUST COMPANY, N.A., et al., Defendants.**

**Case No. 01–1168.**

United States District Court, C.D. Illinois, Peoria Division.

Nov. 27, 2002.

888

Dean B. Rhoads, Robert Rhode, Edward Sutkowski, Steven Oates, Sean Anderson, Gregory J. Pals, Sutkowski & Rhoads, Peoria, IL, for Plaintiffs, Debra Keach and Patricia Sage.

Timothy Bertschy, Heyl, Royster, Voelker & Allen, Peoria, IL, Robert Eccles, Shannon M. Barrett, O'Melveny & Myers LLP, Washington, DC, for Defendant, U.S. Trust Company, NA, fka U.S. Trust Company of California.

Charles Roth, James Springer, Joseph Z. Sudow, Kavanagh Scully Sudow White & Frederick, Peoria, IL, Michael T. Graham, Nancy Ross, McDermott Will & Emery, Trent P. Cornell, Duane Morris LLC, Chicago, IL, for Defendant Ellen D. Foster, Executrix of the Estate of Thomas S. Foster and as Co–Trustee of the Thomas S. Foster Trust executed on 4/14/94.

Michael T. Graham, Nancy Ross, McDermott Will & Emery, Chicago, IL, for Defendant The Northern Trust Company, an Illinois Corporation as Co–Trustee of the Thomas S. Foster Trust executed on 4/14/94.

Richard J. Paulter, Jennifer Baetje, Thompson & Coburn, St. Louis, MO, for Defendants, Robert A. Ostertag, Jr., Terry P. Cole, Alan R. Dix, Jon Elletson, A. Robert Pellegrino.

James Bailey, Paul Ondrasik, Jr., Steptoe & Johnson, Washington, DC, Roy Davis, David Lubben, Davis & Campbell LLC, Peoria, IL, for Defendants, Valuemetrics, Inc.

Mark Casciari, Ian Hugh Morrison, Sari M. Alamuddin, Seyfarth Shaw, Chicago, IL, for Defendant, Houlihan, Lokey, Howard & Zukin, Inc.

Charles Roth, James Springer, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendant, Stephen P. Bartley.

Stephen Gay, Jeffrey Alan Ryva, Husch & Eppenberger LLC, Peoria, IL, for Defendant, Lyle Dickes.

Jeffrey Rock, Hasselberg Rock Bell & Kuppler, Peoria, IL, for Defendant, James Freid.

Charles Roth, James Springer, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendant, Dale Fujimoto.

John Elias, Robert Riffle, Cynthia Elias, Elias Meginnes Riffle & Seghetti, Peoria, IL, for Defendant William Gehring, Henry Gregory, Ii, John F. Halpin, James Kyle, John Lappegaard, George Mckittrick, Clayton Patino, Jerry Rathmann, W. Thomas Stumb, Mark Swedlund, Leo Vanderlugt, Robert Wilson, Bruce Wright.

Jeffrey Rock, Hasselberg Rock Bell & Kuppler, Peoria, IL, for Defendant, Richard Hodgson.

Dean Essig, Washington, IL, for Defendant, Gregory McAllister.

Charles Roth, James Springer, Joseph Sudow, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendants, Michael Norbutas, Frederick Stuber, and for Defendant Ashley Anne Foster, as trustee or agent of the Ashley Anne Foster Irrevocable Trust, and Melvyn R. Regal, individually, as trustee or agent of the Steven Jay Regal Trust, as trustee or agent of the Judi Lynn Regal Trust, and as trustee or agent of the John E. Regal Trust.

## ORDER

MIHM, District Judge.

Now before the Court are Plaintiffs' Motion for Partial Summary Judgment as to Liability Against U.S. Trust: Absence of Authority, Second Motion for Partial Summary Judgment as to Liability Against U.S. Trust: Breach of Loyalty and Prudence: Failure to Investigate, and Third Motion for Partial Summary Judgment as

to Liability Against U.S. Trust: ERISA § 406 Prohibited Transactions on December 20, 1995, as well as U.S. Trust's Alternative Motion for Leave to File an Amended Answer. For the reasons set forth below, the three Motions for Partial Summary Judgment [# 278, # 287, and # 311] are DENIED, and U.S. Trust's Alternative Motion [# 347] is GRANTED.

## FACTUAL BACKGROUND

The following facts are not in dispute unless otherwise indicated. Foster & Gallagher, Inc. ("F & G") was a direct marketing firm engaging in the marketing of gifts, housewares, and novelty items through the mail. Over time, F & G began to market horticultural products through its direct mail operations. F & G was an employer engaged in commerce or in an industry or activity affecting commerce within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA").

On January 1, 1988, F & G established an employee stock ownership plan ("ESOP"). On January 1, 1999, the ESOP was amended and restated and continues to operate as a defined contribution, leveraged employee stock ownership plan, covering substantially all employees of F & G and its subsidiaries. The ESOP is an employee pension benefit plan within the meaning of ERISA. F & G is the sponsor of the ESOP, and Plaintiffs Debra Keach and Patricia Sage (collectively referred to as "Plaintiffs") are participants in the ESOP. Defendant U.S. Trust is the present trustee of the ESOP and a fiduciary with respect to the ESOP. In this capacity, U.S. Trust holds the plan assets, manages the assets of the ESOP, makes distributions to participants, and administers the payments of interest and principal on certain loans.

In 1995, Thomas Foster ("Foster") was CEO/Chairman of the Board of Directors of F & G, and was also a director of Michigan Bulb Corporation ("MBC"), a subsidiary purchased by F & G in October 1992. Foster died on July 11, 1996, and Ellen D. Foster is the executrix of his estate. Defendant Melvyn Regal ("Regal") was at all relevant times a shareholder and executive of F & G. In 1995, he was Vice Chairman of the Board of Directors of F & G and a director of MBC.

The F & G ESOP began in 1988 with the purchase of 3,587,573 shares of F & G stock from certain shareholders, including Foster and Regal, using a $3 million cash contribution from F & G and $47 million from the proceeds of a loan through F & G. All contributions were to be controlled by a trustee "acting under a Trust which forms a part of the Plan." Under the F & G Employee Stock Ownership Trust dated 1988 (the "ESOP Trust"), the trustee of the ESOP was authorized to purchase shares in F & G.

LaSalle National Bank was the original trustee of the ESOP. The ESOP Trust provided that "[t]he Company may, at its discretion, remove a Trustee by giving thirty (30) days advance written notice to the Trustee, subject to providing the removed Trustee with satisfactory written evidence of the appointment of a successor Trustee and of the successor Trustee's acceptance of the trusteeship." Article VI, Section VI–2. Article VIII, Section VIII–1 further provided that the Company reserved the right to amend the ESOP Trust at any time, "except that no amendment shall substantially change the rights, duties and liabilities of the Trustee under this Trust Agreement without its consent."

On March 3, 1989, Community Bank of Greater Peoria was appointed to replace LaSalle National Bank as trustee of the ESOP. As part of this process, F & G and Community Bank entered an Indemnification Agreement, which contained a clause

providing that where there was a conflict between the terms of the Indemnification Agreement and any provision of either the Plan or the Trust, the Indemnification Agreement would supercede the Plan and the Trust. Indemnification Agreement, Section 1. Section 5 of the Agreement further stated that "this Agreement shall apply from the date upon which the Bank became the independent trustee of the Plan and the Trust and shall remain in full force and effect with regard to any matters covered hereunder, irrespective of whether the Bank is then serving as independent trustee of the Plan and the Trust." Moreover, Section 7 provided that any amendment to the Agreement must be in writing and signed by both parties. LaSalle National Bank acknowledged its resignation and replacement by Community Bank as trustee of the ESOP on March 23, 1989. In 1994, Community Bank had been sold to Magna Bank of Illinois, and as such, by July 1995, Magna Bank was acting as trustee of the ESOP.

Defendant Valuemetrics performed an annual valuation of F & G shares for the ESOP every year from 1988 through 1994. On March 16, 1995, Valuemetrics proposed to assist the ESOP Administrative Committee and F & G's Board of Directors in outlining and reviewing the significant elements of a subsequent sale or sales of stock to the ESOP. By March 23, 1995, Foster had told Lyle Dickes ("Dickes"), F & G's Executive Vice President, to go ahead with the Valuemetrics proposal.

Valuemetrics met with F & G representatives on May 8, 1995. Based on the assumption that the shareholders wanted liquidity in the near term and for F & G to remain healthy and viable, Valuemetrics concluded: (1) a large leveraged ESOP ($50–70 million) or a recapitalization would meet those goals; (2) an ESOP of this size would be able to acquire a significant number of shares but would not be able to buy all of the remaining shares; (3) the selling shareholders could take advantage of favorable tax treatment; (4) a recapitalization would allow the shareholders to sell their entire interest but would result in capital gains tax; and (5) an initial public offering ("IPO") of the stock would be less desirable because the market may restrict the amount of shares the controlling shareholders could sell as part of the IPO. On May 10, 1995, Valuemetrics issued a valuation of F & G as of December 31, 1994 in which it concluded that on a marketable minority basis, the value of the capital stock was $162 million, which represented a 38% increase over the previous year's valuation of $117 million. At this time, Valuemetrics was also consulting with F & G about ownership transition strategies and the expanded use of the ESOP as a means of achieving the desired purchase or liquification of the stock holdings of the selling shareholders, including Foster and Regal. Given the primary goals of these shareholders to provide immediate liquidity and to maximize the present value of their after-tax proceeds received from a sale of their stock and the value of their residual shares in F & G, Valuemetrics found a leveraged ESOP transaction and a recapitalization or sale of F. & G to a strategic buyer to be "far superior" options.

Norman Goldberg ("Goldberg") was at relevant times the manager of U.S. Trust's Washington, DC, office and acted on behalf of its Special Fiduciary Committee where U.S. Trust acted as an institutional trustee specialized investment manager for transactions involving ERISA issues. In late June 1995, Goldberg met with Regal, Dickes, and others. By July 5, 1995, F & G had reached an agreement with U.S. trust for a fee schedule regarding the contemplated ESOP transaction which included fees for the transactional decision and

follow-up services as the independent fiduciary.

On July 17, 1995, Valuemetrics advised F & G that it would be pleased to be retained by F & G's board of directors to provide financial advisory services, including: (1) updating its December 31, 1994, ESOP valuation analysis to estimate a revised range for the fair market value of F & G shares on·a control basis; (2) determining an optimal structure of the security to be purchased by the ESOP in order to maximize the value received by the selling shareholders; (3) preparing a transaction memorandum for the board discussing the important aspects of the transaction structure; (4) meeting with the board to discuss the transaction memorandum; and (5) presenting and issuing an opinion on the fairness of the transaction. Valuemetrics then issued a valuation on July 24, 1995, reporting that as of July 20, 1995, the value of F & G stock on a control basis was $229.2 million.[1]

On August 30, 1995, Goldberg wrote to Regal to confirm the understanding and agreement between F & G and U.S. Trust "with respect to certain professional services to be provided by U.S. Trust to the Foster & Gallagher, Inc. Employee Stock Ownership Plan and related Trust established by the Company (collectively, the 'Plan')." Among other things, the letter stated:

1. Foster and Gallagher, Inc. (the "Company") desires to retain U.S. Trust Company of California, N.A. ("U.S.Trust") as the independent trustee of the Foster & Gallagher, Inc. Employee Stock Ownership Plan (the "ESOP") in conjunction with a possible purchase of Company stock by the ESOP and related actions (hereinafter collectively referred to as the "Proposed Transaction").

2. It is understood that in exercising its responsibilities pursuant to this Agreement, U.S. Trust will rely on the written opinion of the Plan's independent financial advisor that (i) the consideration to be paid by the Plan is not in excess of "adequate consideration" within the meaning of Section 3(18) of ERISA; (ii) the Proposed Transaction is fair and reasonable to the Plan from a financial point of view; and (iii) the terms and conditions of the acquisition loan are fair and reasonable to the ESOP from a financial point of view (the "Financial Opinion"). If for any reason the Financial Advisor does not provide the Financial Opinion in form satisfactory to U.S. Trust at or prior to the Closing, U.S. Trust will not be required to make a final determination whether to participate in the Proposed Transaction. Although the fees and expenses incurred by U.S. Trust pursuant to this Agreement will be paid by the Company, it is understood that U.S. Trust's sole professional responsibilities are to the Plan and the Plan participants.

3. The Company will furnish or cause to be furnished to U.S. Trust or its Financial Advisor all current and historical financial and other information regarding the Company requested by U.S. Trust or its Financial Advisor in order for U.S. Trust to perform its obligations hereunder. The Company represents that the information which it provides will be accurate and complete in all material respects to the best of its officers' knowledge and it is understood that U.S. Trust will rely on the accuracy of that representation to carry out its responsibilities pursuant to this Agreement.

\* ·\* \* \* \* \*

---

**1.** Note that the previous valuation was made on a minority interest basis, while the July 1995 valuation was made on a marketable controlling interest basis.

5. Except as otherwise required by paragraph 7, as compensation for the services to be rendered by U.S. Trust in connection with the Proposed Transaction, the Company will pay to U.S. Trust the sum of $75,000 to be paid in three installments of $32,500, $32,500, and $10,000. . . . No portion of the fee to U.S. Trust under this paragraph or reimbursement of its expenses under paragraph 5 hereof is contingent in any way upon the consummation of the Proposed Transaction or the decision by U.S. Trust, as Trustee, whether to purchase the Company Stock pursuant to the Proposed Transaction.

On August 31, 1995, Dickes signed the engagement letter with U.S. Trust on behalf of F & G.

On September 26, 1995, Defendant Houlihan Lokey ("Houlihan") was engaged to render a written opinion to U.S. Trust as the ESOP trustee as to whether the proposed stock transaction was fair to the ESOP from a financial point of view. The engagement letter indicated that although Houlihan would report solely to U.S. Trust, F & G would pay Houlihan's fees and expenses, and Houlihan would use, rely on, and assume the accuracy of "without independent verification, data, material, financial forecasts and projections and other information with respect to the Company [F & G], furnished to Houlihan Lokey by or on behalf of the Company [F & G] and its agents, counsel, employees and representative."

On September 30, 1995, Valuemetrics issued its first transaction memorandum to the F & G board of directors describing a proposed offer to sell 2,916,667 shares to the ESOP at $24.00 per share. In its memorandum, Valuemetrics noted that the memorandum included certain statements, including projections, with respect to the anticipated future performance of F & G and cautioned that: (1) such statements were based on various estimates and assumptions by F & G, which estimates and assumptions may or may not prove to be correct; (2) although the projections contained therein had been prepared with significant good faith input from F & G's management, such projections involve significant elements of subjective judgment and analysis and would be materially different if different estimates and assumptions were employed; and (3) no representation was made as to the accuracy of any such statements, and there could be no assurance that the projected results would be obtained.

Valuemetrics then summarized the ESOP transaction as follows: (1) F & G's board of directors would authorize the conversion of the current Executive Incentive Plan ("EIP") from a book value basis to a market value basis, which would create a significant income tax benefit to F & G; (2) F & G's management employees would have the opportunity to exercise 527,141 EIP options at an average exercise price of $4.60 per share; (3) of the 2,916,667 total shares offered to the ESOP, 1,790,243 shares would be offered on a pro-rata basis from Foster and Regal, and 1,126,424 shares would be offered by management, either through the sale of existing shares or through the exercise of options granted as part of the EIP; (4) those employees who sold shares to the ESOP would have an opportunity to purchase, on a pro-rata basis, 626,858 newly issued, restricted shares at market value; and (5) $10.25 million of the proceeds generated from the recapitalization of the EIP shares would be used to repay existing, non-tax preferred debt from Comerica Bank and NBD Bank. Following this transaction, the ESOP would own 51.7% of the equity value of F & G.

On October 17, 1995, representatives from U.S. Trust and Houlihan met with

executives of F & G to perform due diligence regarding the ESOP transaction. They met with Regal, Robert Pellegrino (former President, Vice Chairman of the Board of F & G), Frederick Stuber (F & G's Senior Vice President of Finance), Dickes, Joseph Sudow (an attorney from Kavanagh, Scully, Sudow, White, and Frederick, P.C. (the "Kavanagh firm")), and others for most of a day. US Trust's Goldberg also recalls a discussion that day with Robert Ostertag (former President and CEO of MBC; President and CEO of F & G) involving MBC and its sweepstakes marketing.

On October 26, 1995, Valuemetrics issued an Analysis of Value for the ESOP purchase in which it concluded that the value of F & G as of October 24, 1995, ranged from $298.5 to $311.4 million on a marketable control basis.

At a Board of Directors meeting on October 26–27, 1995, the F & G board adopted a resolution approving the proposed ESOP transaction and authorizing the officers of the corporation to take all steps necessary and proper to bring about the completion of the transaction. The members of the Executive Committee, which consisted of Foster, Regal, and Pellegrino, were authorized to approve changes to the proposal.

Price negotiations involving F & G and U.S. Trust continued during the month of November 1995. On November 29, 1995, U.S. Trust (through Goldberg) announced that it was willing to recommend that the ESOP purchase a controlling block of F & G shares at $19.50 per share. US Trust did not consult with Magna Bank regarding the sale price at or before this time.

At 10:00 a.m. that same day, F & G's board held a telephonic meeting to discuss the proposed sale price per share. The board authorized the Executive Committee to proceed with the ESOP transaction at a price of $19.50 per share.

In a December 4, 1995, letter, Regal (acting on behalf of F & G) notified Magna Bank that it was being removed as trustee of the ESOP "subject to our providing you with satisfactory written evidence of the appointment of a successor and of the successor trustee's acceptance of the trusteeship." Magna Bank acknowledged its receipt of this letter on December 6, 1995.

On December 12, 1995, the firm of Sonnenschein, Nath & Rosenthal, which was retained as counsel for U.S. Trust in connection with the due diligence for the ESOP transaction, faxed a Legal Document Review Memorandum to the Kavanagh firm, as counsel for F & G, Foster, and Regal, requesting certain documents to be provided for review. Among the documents requested were copies of any significant correspondence with any regulatory agencies.

On December 19, 1995, the ESOP transaction was approved by U.S. Trust's Special Fiduciary Committee, and U.S. Trust accepted the custodial account. The next day, on December 20, 1995, F & G's Executive Committee unanimously entered a resolution authorizing the Vice Chairman or any Vice President of the company to execute and deliver certain documents, including the Note Agreement between the company and the lenders, $19,999, 998.50 Series A Senior ESOP Notes, $50,000,000 Series B Senior ESOP Notes, the F & G Employee Stock Ownership Trust as amended and restated effective December 20, 1995, and the F & G Employee Stock Ownership Plan as amended and restated effective January 1, 1995. The resolution also authorized the officers of the company to take "all other such actions that are necessary and proper to effectuate the above resolution . . . ." Pursuant to this authority, Regal, acting on behalf of F & G, authored a letter appointing U.S. Trust as trustee of the ESOP and signed the

amended and restated Employee Stock Ownership Trust that same day.

Also on December 20, 1995, U.S. Trust accepted the appointment as successor trustee of the ESOP and made written findings in connection with the ESOP transaction. In the written findings, U.S. Trust expressly noted its reliance on the opinions it received from Houlihan, Sonnenschein Nath & Rosenthal as counsel to the trustee, Mayer Brown & Platt as the company's special ESOP counsel, the Kavanagh firm as general corporate counsel to F & G, and Price Waterhouse, as well as Valuemetrics' transaction memorandum, the representations and warranties of F & G and its controlling shareholders, and the pertinent finance documents. US Trust stated that the terms and conditions of the transaction were prudent and reasonably designed to further the purposes of the ESOP, satisfied the requirements of Section 408(e) of ERISA and Section 4875(d)(13) of the Internal Revenue Code, and also that the purchase price of the shares did not exceed the fair market value of the shares.

US Trust then entered into a Stock Purchase Agreement with Foster, Regal, Pellegrino, and other F & G officers and directors. In doing so, U.S. Trust caused the ESOP to use the proceeds of a $70 million loan to purchase 3,589,743 F & G shares from the following shareholders:

| Shareholder | Shares | Purchase Price |
| --- | --- | --- |
| Stephen P. Bartley | 11,974 | $ 233,493.00 |
| James B. Daken | 23,948 | $ 466,986.00 |
| Lyle T. Dickes | 100,000 | $ 1,950,000.00 |
| James N. Freid | 19,158 | $ 373,581.00 |
| Dale Fujimoto | 15,000 | $ 292,500.00 |
| William J. Gehring | 53,571 | $ 1,044,634.50 |
| Henry R. Gregory, II | 30,000 | $ 585,000.00 |
| John F. Halpin | 14,369 | $ 280,195.50 |
| Richard S. Hodgson | 20,814 | $ 405,873.00 |
| James H. Kyle | 14,369 | $ 280,195.50 |
| John Lappegaard | 30,000 | $ 585,000.00 |
| Gregory K. McAllister | 11,974 | $ 233,493.00 |
| George McKittrick | 5,000 | $ 97,500.00 |
| Michael F. Norbutas | 45,336 | $ 884,052.00 |
| Robert A. Ostertag, Jr. | 150,000 | $ 2,925,000.00 |
| Clayton Patino | 19,229 | $ 374,965.50 |
| A. Robert Pellegrino | 211,623 | $ 4,126,648.50 |
| Jerry L. Rathmann | 53,571 | $ 1,044,634.50 |
| Frederick J. Stuber | 64,285 | $ 1,253,557.50 |
| W. Thomas Stumb | 10,000 | $ 195,000.00 |
| Mark Swedlund | 50,000 | $ 975,000.00 |
| Leo A. Vandervlugt | 42,857 | $ 835,711.50 |
| Robert J. Wilson | 31,133 | $ 607,093.50 |
| Bruce B. Wright | 69,643 | $ 1,358,038.50 |
| Steven Jay Regal Trust | 33,000 | $ 643,500.00 |
| Judi Lynn Regal Trust | 33,000 | $ 643,500.00 |
| John E. Regal Trust | 33,000 | $ 643,500.00 |
| Ashley Anne Foster Irrevocable Trust | 6,475 | $ 126,262.50 |
| Thomas S. Foster | 1,698,502 | $33,120,789.00 |
| Melvyn R. Regal | 687,912 | $13,414,284.00 |

Each of these selling shareholders signed a written receipt for the purchase price.

Goldberg did not personally consult with Magna Bank regarding the sale price and also stated that, to his knowledge, Magna Bank was not present at the closing or consulted at the closing by telephone. At 4:21 p.m. on December 21, 1995, Frederick Stuber, F & G's Senior Vice President of Finance, faxed a copy of U.S. Trust's written acceptance of appointment as trustee of the ESOP to Barbara Friend at Magna Bank. Prior to that time, Magna Bank had not received written evidence of U.S. Trust's acceptance.

Over the next three years, consumers and state attorney generals' offices continued to inquire into MBC's compliance with the law. On April 12, 1996, an Investigator with the Consumer Protection Division of the Michigan Attorney General wrote to Ostertag and advised that the office had received many complaints about MBC since early 1995. In July 1996, the Connecticut Attorney General sued MBC as part of "Project Jackpot," a nationwide effort in conjunction with the Federal Trade Commission, to prosecute sweepstakes and contest promoters accused of fraud. In 1997, MBC continued to respond to various states' inquiries into their sweepstakes. In October 1997, MBC entered into an Assurance of Discontinuance with the state of Michigan, agreeing to cease distribution of certain sweepstakes promotions after December 31, 1997. In January 1998, the Indiana Attorney General sent a civil investigative demand to MBC; that August, the Deputy Attorney

General of the State of Indiana wrote MBC's sweepstakes counsel regarding a multi-state inquiry into MBC's use of sweepstakes promotions on behalf of Alabama, Arizona, Arkansas, Indiana, Kansas, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Texas, West Virginia, and Wisconsin. Also in August 1998, MBC entered into a Stipulated Settlement on the Connecticut suit which enjoined MBC from engaging in certain sweepstakes marketing practices in the state for a period of seven years and required MBC to pay $20,000.

Beginning in 1998, MBC's revenue bases suffered extensive damage as a result of the negative publicity targeting sweepstakes marketing. Over the next three years, MBC's gross revenues declined from $197 million in 1998, to $116 million in 1999, to $65 million in 2000. During the same time period, F & G also experienced a decline in gross revenues from $471 million, to $368 million, to $337 million.

In September 1999, Defendants Ostertag, Cole, Dix, and Elletson, members of the ESOP administrative committee, reported that on December 31, 1998, the value of the ESOP's F & G shares was $8.52 per share, as compared to the reported value of $20.33 per share on December 31, 1997. The total value of F & G shares owned by the ESOP decreased by more than $83 million in 1998, and the reported net value of ESOP assets, after deducting liabilities, decreased more than 90% from a net value of more than $82 million on December 31, 1997, to a net value of just over $7 million on December 31, 1998.

On April 6, 2001, Plaintiffs filed this suit. They bring their claims against numerous defendants pursuant to ERISA. Plaintiffs have now moved for partial summary judgment against U.S. Trust. The motion is fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return

a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

## I.  ABSENCE OF AUTHORITY

■ Plaintiffs assert that U.S. Trust was only a co-trustee of the ESOP at the time of the stock purchase transaction, and therefore could not have acted without the consent of Magna Bank. Specifically, Plaintiffs contend that because Magna Bank did not receive written notice of U.S. Trust's acceptance of the trusteeship until December 21, 1995, Magna Bank remained a co-trustee of the ESOP at the time that the stock purchase transaction closed on December 20, 1995. Thus, they argue that U.S. Trust and Magna Bank had joint authority and power over the plan assets and that U.S. Trust lacked authority to commit the ESOP to the transaction individually.

The terms of the 1988 ESOP trust agreement provided that F & G could remove Magna Bank as trustee "by giving thirty (30) days advance written notice to the Trustee, subject to providing the removed Trustee with satisfactory written evidence of the appointment of a successor Trustee and of the successor Trustee's acceptance of the trusteeship." It is undisputed that although Magna Bank was given written notice of its replacement as trustee for the ESOP on December 6, 1995, it did not receive written notification of U.S. Trust's acceptance of the trusteeship until December 21, 1995, the day after the stock purchase transaction closed. It is also undisputed that 30 days had not passed between the time F & G gave Magna Bank notice of its removal and December 20, 2002, when U.S. Trust purported to act as sole trustee of the ESOP in closing the stock purchase transaction.

Initially, U.S. Trust argues that the removal provision of the ESOP trust specifies no timing requirement on when the written evidence must be provided and does not state that the trustee must receive this written evidence before the trustee can be considered removed. The Court agrees, particularly in light of the reference in the same provision to the written evidence being supplied to the "removed Trustee." This suggests that, although the outgoing trustee might still have some fiduciary obligations under ERISA, the outgoing trustee could be removed prior to actually receiving the written confirmation that a successor trustee had been appointed and accepted the appointment.

The record indicates that Magna Bank had actual, although not written, notice of F & G's decision to remove it as trustee, U.S. Trust's appointment as successor trustee, and U.S. Trust's acceptance of the trusteeship prior to December 20, 1995, with the written confirmation following on December 21, 1995. While this sequence of events may have some bearing on when Magna Bank's fiduciary duties to the ESOP ended, that question is not before the Court because Magna Bank is not a party to this litigation. The cases relied on by Plaintiffs go to the issues of when a trustee's fiduciary liability ends and whether that trustee can be liable to the plan if it does not properly terminate its fiduciary relationship; they do not stand for the proposition that a relationship that does not terminate in a textbook manner automatically results in a co-trustee relationship. Accordingly, the Court rejects Plaintiffs argument that because F & G had not yet delivered written proof of U.S. Trust's acceptance of the trusteeship, U.S. Trust and Magna Bank were co-trustees from December 20, 1995, to December 21, 1995.

■ Plaintiffs also argue that U.S. Trust and Magna Bank were effectively co-trustees on December 20, 1995, because 30 days had not passed since F & G delivered its written notice of removal to Magna Bank. Citing *Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 119 (7th Cir. 1989), and *H.J., Inc. v. ITT*, 867 F.2d 1531, 1545–46 (8th Cir.1989), U.S. Trust responds that ERISA rights may be waived, and that a valid waiver need not be express, but rather can be inferred from the conduct of the party. Accordingly, U.S. Trust argues that Magna Bank could and did waive any applicable requirements for its removal.

In this respect, certain relevant facts are undisputed. Regal wrote to Magna Bank on December 4, 1995, stating:

> We do hereby remove you as Trustee under the Foster & Gallagher, Inc. Employee Stock Ownership Trust, subject to our providing you with satisfactory written evidence of the appointment of a successor trustee and of the successor trustee's acceptance of the trusteeship. Upon our providing you with such evidence, we would appreciate your delivering the assets of the Trust to the successor trustee:
>
> U.S. Trust Company of California, N.A.
> 1300 I Street, N.W., Suite 1080 East
> Washington, D.C. 20005–3314
> Attention: Normal P. Goldberg, Esq. Senior Vice President

That same day, Regal also sent a letter to Goldberg stating, "We do hereby appoint you, U.S. Trust Company of California, N.A., ... Successor Trustee ("Trustee") under the Foster & Gallagher, Inc. Employee Stock Ownership Trust." Barbara Friend ("Friend") acknowledged receipt by Magna Bank of the notice of removal on December 6, 1995.

On December 18, 1995, Stuber faxed Friend a draft Collateral Custody Agreement with a cover memorandum requesting that Magna Bank provide its Custodial Fee Schedule to be used as Exhibit A to the agreement. The draft agreement referred to U.S. Trust as acting "solely as Trustee of the Foster & Gallagher, Inc. Employee Stock Ownership Trust (in such capacity, the 'Trustee')" and referred to Magna Bank as a collateral agent and custodian. The draft also contained an indemnification clause protecting Magna Bank from costs, expenses, etc., incurred "by reason of any action taken upon instructions or directions by the Company or the Trustee (with respect to the tender or exchange of Company Shares or designation of an account for transfers of Proceeds) or any inaction by the Bank in the absence of such instructions or directions." Later that day, Friend then faxed Magna Bank's fee schedule to Stuber, stating "Here is Exhibit 'A' to the Collateral Custody Agreement with regard to the ESOP transaction."

Even though Friend has testified that she still considered Magna Bank to be the trustee of the ESOP at the time of the stock purchase, her testimony concerning the basis for this belief is somewhat conflicting. Moreover, her (and therefore Magna Bank's) actions, or lack thereof, speak louder than her subsequent words. On this record, a reasonable factfinder could conclude that had Magna Bank considered itself trustee at the time of the stock transaction, it would have been cognizant of its fiduciary duty to act in the interests of the ESOP beneficiaries and would have become affirmatively involved by requesting information about the transaction and asserting its right to approve the sale rather than sitting back and doing nothing. To suggest that Magna Bank could have knowledge of the fact that a multi-million dollar stock purchase by a trust to which it believed it had a fiduciary duty was imminent but that it could never-

theless simply sit back and hide its head in the sand because it had no information is preposterous.

Magna Bank did not inquire into the details of the ESOP transaction, did not assert any right to additional information about the transaction, did not assert that its consent as trustee was required for the transaction to proceed, did not attend the closing, and did not attempt to prevent the closing. In fact, the record suggests that Magna Bank immediately assumed its new role as collateral agent and custodian, that Magna Bank had notice of the proposed transaction, that U.S. Trust was accepting the trusteeship, that F & G considered U.S. Trust to be acting as sole trustee, and that F & G did not believe that Magna Bank was still trustee of the ESOP or that its approval was required in order to consummate the transaction.

■ The Seventh Circuit has acknowledged that "just as could any party to any contract," a party to an ERISA-related contract could choose to waive a contractual requirement. *Harris Trust and Savings Bank v. John Hancock Mutual Life Insurance Co.*, 302 F.3d 18, 27 (2d Cir. 2002). In fact, in the prior history of the F & G ESOP, LaSalle Bank waived the 30–day notice requirement when it was removed as trustee to the ESOP in favor of Community Bank, and Plaintiffs do not argue that that waiver was somehow improper.

Here, there is evidence from which the trier of fact could reasonably conclude that Magna Bank implicitly accepted its removal and waived its right to the 30–day notice and follow-up evidence, or that Magna Bank acquiesced in and ratified the actions taken by U.S. Trust. However, as the record is not such that the trier of fact could only find in favor of U.S. Trust on this issue, the Court finds genuine issues of material fact requiring resolution at tri-

al with respect to this aspect of Plaintiffs' Motion.

In summary, the Court has rejected Plaintiffs' argument that U.S. Trust and Magna Bank were co-trustees of the ESOP from December 20, 1995, to December 21, 1995, because F & G had not yet delivered written proof of U.S. Trusts' acceptance of the trusteeship; this issue is no longer part of this case. However, the same result does not follow with respect to Plaintiffs' argument that U.S. Trust and Magna Bank were co-trustees of the ESOP because the 30–day notice period established in the ESOP trust had not passed. Although the evidence of record could support the reasonable conclusion that Magna Bank either waived the 30–day notice period or alternatively ratified U.S. Trusts' actions, the evidence is not of sufficient magnitude that such a conclusion would be compelled. Accordingly, the questions of waiver and ratification present genuine issues of material fact requiring resolution at trial, and Plaintiffs' Motion for Partial Summary Judgement as to Liability Against U.S. Trust: Absence of Authority is denied.

## II. BREACH OF LOYALTY AND PRUDENCE: FAILURE TO INVESTIGATE

■ Plaintiffs second motion seeks a finding that U.S. Trust breached its duty of loyalty and prudence by failing to conduct an adequate investigation in connection with the December 20, 1995, stock purchase transaction by the ESOP. Plaintiffs base their argument in part on their contention that Foster and Regal admittedly did not make adequate disclosure to U.S. Trust, which was previously rejected and found to present a genuine issue of material fact for trial in the Court's November 18, 2002, Order denying Plaintiffs'

First Motion for Summary Judgment against Foster and Regal.

Like the motion at issue in the November 18, 2002, Order, this motion again takes particular pieces of evidence out of context and attaches to them Plaintiffs' characterization of what the evidence shows. In doing so, Plaintiffs ignore disputes of fact as to who knew what and when, what was provided to whom at what time, the scope of U.S. Trust's inquiry, etc., that involve assessments of credibility that must be resolved at trial. Situations involving clear disputes of material fact are plainly inappropriate for resolution on summary judgment. Accordingly, the Court denies Plaintiffs' Second Motion for Partial Summary Judgment without further discussion.

### III. ERISA § 406 PROHIBITED TRANSACTIONS ON DECEMBER 20, 1995

Finally, Plaintiffs argue that U.S. Trust violated § 406(a) of ERISA by causing the ESOP to engage in a potentially abusive transaction. Section 406(a) is a per se prohibition on such transactions unless the transaction meets certain statutory exemptions under § 408(e). As U.S. Trust has not pled an affirmative defense under § 408(e), Plaintiffs contend that it is liable as a matter of law.

US Trust responds that no court has ever specifically held § 408(e) to be an affirmative defense that must be pled for purposes of Federal Rule of Civil Procedure 8(c). Be that as it may, the Court notes that there is no binding case law holding that § 408(e) is not an affirmative defense either.

■ Section 408(e) provides in relevant part that § 406 does not apply to the acquisition or sale by a plan of qualifying employer securities if certain conditions are met:

(1) if such acquisition ... is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 1107(e)(1) of this title),

(2) if no commission is charged with respect thereto, and

(3) if—

    (A) the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title)....

29 U.S.C. § 1108(e). As § 408(e) clearly places the burden of proof on the defendant, this Court now finds that a fiduciary's invocation of an exception under § 408(e) is an affirmative defense that must be pled. *See Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir.1996); *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1215 (2nd Cir.1987); *Donovan v. Cunningham,* 716 F.2d 1455, 1467–68 (5th Cir.1983); *Montgomery v. Aetna Plywood, Inc.,* 39 F.Supp.2d 915, 919, 935 (N.D.Ill. 1998); *Reich v. Valley National Bank of Arizona,* 837 F.Supp. 1259, 1272 (S.D.N.Y. 1993). Any suggestion to the contrary lacks merit.

■ Although Plaintiffs correctly assert that a failure to plead an affirmative defense can result in waiver, they ignore the corresponding maxim that where the opposing party is provided with notice of and a full opportunity to respond to an affirmative defense, a technical failure to plead the defense does not result in waiver. *Vaughn v. King,* 167 F.3d 347, 352 (7th Cir.1999). Here, U.S. Trust has consistently denied that it caused the ESOP to pay more than adequate consideration and maintained from the time it filed its answer that it acted in good faith and that the stock purchase transaction met the requirements of § 408(e) for exemption from the prohibited transaction requirements of ERISA.

Whether U.S. Trust's failure to affirmatively plead this defense or otherwise acknowledge its burden of proof was strategic or mere oversight, Plaintiffs cannot credibly claim unfair surprise and have demonstrated no substantial prejudice. Accordingly, for purposes of presenting a complete record, U.S. Trust's Alternative Motion for Leave to File an Amended Answer for purposes of adding the affirmative defense is granted, and Plaintiffs' Third Motion for Partial Summary Judgment is denied.

■ That being said, the Court is disturbed by the inconsistency in the burden of proof position taken by U.S. Trust in this case, as opposed to the position that it took in the case of *Henry v. Champlain Enterprises, Inc., et al.,* Case No. 01–cv–1681, in the United States District Court for the Northern District of New York, as well as the fact that counsel for U.S. Trust has authored a portion of a book on ERISA fiduciary litigation in which he wrote:

> Borrowing from the law of trusts, decisions in ERISA cases have generally recognized that once a beneficiary has established that a prohibited transaction has taken place, the burden of explaining or justifying the transaction shifts to the fiduciary, who must prove that the transaction was undertaken for adequate consideration. One who acts in violation of his or her fiduciary duty bears the burden of showing that he or she acted fairly and reasonably.

Robert N. Eccles, *ERISA Fiduciary Law,* Chapter 14, at 403–04.

This Court is not an arena for playing games. Had U.S. Trust followed its prior position and the apparent opinion of its counsel by pleading an affirmative defense under § 408(e) in its Answer or at least otherwise affirmatively acknowledging its burden of proof of this issue, Plaintiffs would not have incurred the costs of filing

their Third Motion for Partial Summary Judgment. As a result of U.S. Trust's inconsistent positions, the Court finds that U.S. Trust should pay the reasonable attorneys fees incurred by Plaintiffs in filing their Third Motion for Partial Summary Judgment. Plaintiffs shall compile an invoice for their attorneys fees reasonably incurred in preparing the Third Motion for Partial Summary Judgment and Combined Reply in support thereof and submit it to counsel for U.S. Trust within 14 days. US Trust will then either remit this amount to Plaintiffs counsel or file written objections to the reasonableness of the fees incurred with the Court within 14 days of its receipt of Plaintiffs' invoice.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment as to Liability Against U.S. Trust: Absence of Authority [# 278] is DENIED. Plaintiff's Second Motion for Partial Summary Judgment as to Liability Against U.S. Trust: Breach of Loyalty and Prudence: Failure to Investigate [# 287] is DENIED. US Trust's Alternative Motion for Leave to File an Amended Answer [# 347] is GRANTED, and the Amended Answer shall be filed on or before December 9, 2002. Plaintiffs' Third Motion for Partial Summary Judgment as to Liability Against U.S. Trust: ERISA § 406 Prohibited Transactions on December 20, 1995 [# 311] is also DENIED. As set forth in more detail above, Plaintiffs are awarded their reasonable attorneys fees in connection with their Third Motion for Partial Summary Judgment as to Liability Against U.S. Trust.